# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

BERNITA B. WEST,

        Claimant,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Respondent.

\*
\*
\*
\*
\*
\*

CASE NO. 5:07-CV-133 (CAR)
Social Security Appeal

## REPORT AND RECOMMENDATION

The Social Security Commissioner, by adoption of the Administrative Law Judge's determination, denied Claimant's application for social security disability benefits, finding that she was not disabled within the meaning of the Social Security Act and Regulations. Claimant contends that the Commissioner's decision was in error, and she seeks review under the relevant provisions of 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c). All administrative remedies have been exhausted.

## LEGAL STANDARDS

The court's review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence and whether the correct legal standards were applied. *Walker v. Bowen*, 826 F.2d 996 (11th Cir. 1987). Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S. Ct. 1420,

28 L. Ed. 2d 842 (1971). The court's role in reviewing claims brought under the Social Security Act is a narrow one. The court may not decide facts, reweigh evidence, nor substitute its judgment for that of the Commissioner.[1] *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). It must, however, decide if the Commissioner applied the proper standards in reaching a decision. *Harrell v. Harris*, 610 F.2d 355, 359 (5th Cir. 1980). The court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings. *Bloodsworth v. Heckler*, 703 F.2d at 1239. However, even if the evidence preponderates against the Commissioner's decision, it must be affirmed if substantial evidence supports it. *Id.* The initial burden of establishing disability is on the claimant. *Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973). The claimant's burden is a heavy one and is so stringent that it has been described as bordering on the unrealistic. *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).

A claimant seeking Social Security disability benefits must demonstrate that she suffers from an impairment that prevents her from engaging in any substantial gainful activity for a twelve-month period. 42 U.S.C. § 423(d)(1). In addition to meeting the requirements of these statutes, in order to be eligible for disability payments, a claimant must meet the requirements of the Commissioner's regulations promulgated pursuant to the authority given in the Social Security Act. 20 C.F.R. § 404.1 et seq.

---

[1] Credibility determinations are left to the Commissioner and not to the courts. *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991). It is also up to the Commissioner and not to the courts to resolve conflicts in the evidence. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). See also *Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1986).

Under the regulations, the Commissioner determines if a claimant is disabled by a five-step procedure. 20 C.F.R. § 404.1520, Appendix 1, Part 404. First, the Commissioner determines whether the claimant is working. Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities. Next, the Commissioner determines whether the claimant's impairment(s) meets or equals an impairment listed in Appendix 1 of Part 404 of the regulations. Fourth, the Commissioner determines whether the claimant's residual functional capacity can meet the physical and mental demands of past work. Finally, the Commissioner determines whether the claimant's residual functional capacity, age, education, and past work experience prevent the performance of any other work. In arriving at a decision, the Commissioner must consider the combined effect of all the alleged impairments, without regard to whether each, if considered separately, would be disabling. *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984). The Commissioner's failure to apply correct legal standards to the evidence is grounds for reversal. *Id.*

### Administrative Proceedings

Claimant filed a Title II application for disability and disability insurance benefits on January 10, 2005. (T-20). Claimant also filed a Title XVI application for supplemental security income on December 28, 2004. *Id.* Claimant's application was denied initially and on reconsideration. *Id.* Claimant then filed a request for a hearing, which was held on January 17, 2006. (T-929-974). Subsequent to the hearing, the ALJ found that the Claimant was not disabled in a decision dated April 25, 2006. (T-17-32). Claimant then requested a

review of the ALJ's findings by the Appeals Council.  Thereafter, the Appeals Council denied review, making the ALJ's decision  the final decision of the Commissioner.

## Statement of Facts and Evidence

Claimant alleges that she is disabled due to a learning disability and nerve problems. (T-62).  After examining the medical records, the ALJ determined that Claimant had post traumatic stress disorder (PTSD), a history of alcohol abuse, and borderline intellectual functioning, impairments that are severe within the meaning of the Regulations but not severe enough to meet, or medically equal, one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. (T-25-27).  The ALJ then found that Claimant had the residual functional capacity for work at all exertional levels; however, Claimant was limited to performing simple tasks only, which must be done in a structured environment where there will be help setting and reaching goals, and which requires no more than limited public contact.  (T-27).  Additionally, the ALJ found that Claimant had the following mental limitations set forth in "Part B" of the mental listings: mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (R-27).

## ISSUES

**I.    Whether the RFC assessment was based on all of the relevant evidence in the case record and adequately explained?**

**II.    Whether the ALJ committed error in determining the past work and other work Claimant was capable of performing?**

**III.     Whether Claimant received a fair hearing not marred by any personal bias on the part of the ALJ?**

## DISCUSSION

## I.     Whether the RFC assessment was based on all of the relevant evidence in the case record and adequately explained?

Claimant contends that the ALJ neither evaluated nor weighed all of the evidence of Claimant's impairments. (R-10, p.12). Specifically, Claimant contends that the ALJ ignored her difficulties dealing with stress, meeting a schedule, completing tasks, and discredited her doctor's diagnosis of schizoaffective disorder. *Id*.

On February 6, 2004, a psychological evaluation was conducted of Claimant by Nick Carden, Ph.D.. (T-717-19). When asked specifically why she could not work, Claimant stated that she "has a lot of difficulty with her back[2]," but then stated that she was currently working part-time at Dollar General. (T-717). When giving the history of her psychiatric illness, Claimant denied the use of alcohol[3], drugs, or tobacco. *Id*. Claimant also denied

---

[2]  The ALJ noted that although Claimant sometimes reports that her back hurts her, she has not sought treatment for her back in many years. (T-25). Furthermore, the ALJ noted that Claimant readily admitted in her March 2005 consultative examination that she had no physical limitations and had received no treatment or medication for such. *Id*.

[3]  In his findings, the ALJ noted that Claimant has a history of alcohol abuse that was diagnosed as "significant." (T-23). The ALJ further noted that between 1993-1995 Claimant underwent detoxification, and that Claimant's depressive and psychotic symptoms were found to be related to her alcohol abuse. *Id*. Additionally, the ALJ noted that in Claimant's 2001 evaluation Dr. Randal Gage diagnosed Claimant with alcohol abuse, depression, anxiety, and borderline intellectual functioning. (T-24, T-377-379). Claimant informed Dr. Gage that she was currently consuming alcohol on a "frequent basis." (T-378).

having a legal record[4]. *Id.* Dr. Carden found that there was "some mild embellishment of the claimant's symptomology," but also received the impression "that the claimant was presenting a valid sample of her usual and customary behavior." (T-718). Dr. Carden noted that the diagnoses of PTSD and Schizoaffective Disorder, Depressive Type, stemmed from the medical records that he was given. (T-719).

Cal VanderPlate, Ph.D., a consultative examiner found no evidence of schizoaffective disorder when he completed his psychological assessment of the case on March 19, 2004, despite having knowledge of Dr. Keh's diagnosis. (T-729-742). Dr. VanderPlate found no evidence of episodes of decompensation, and only a mild degree of limitation in Claimant's activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence and pace. (T-739).

Dr. John C. Whitley evaluated Claimant on March 1, 2005. (T-743-747). Claimant's psychological complaint revolved around her fear of "bad weather." (T-744). Dr. Whitley noted that Claimant had last been employed from April to December of 2004, at Bess Manufacturing Company bagging tablecloths. *Id.* During the examination, Claimant denied any suicidal or homicidal ideations, as well as any phobias, hallucinations or delusions. (T-745). Dr. Whitley estimated Claimant's overall cognitive ability to be in the Borderline Range. (T-746). Dr. Whitley's diagnostic impression was that Claimant had chronic PTSD, with no mention of schizoaffective disorder. (T-747). Dr. Whitley's summary and

---

[4] In her 2001 evaluation with Dr. Randall Gage, Claimant indicated that she had been jailed the prior year for a DUI charge. (T-378).

recommendation stated:

> [Claimant] reported symptoms associated with PTSD. She continues to experience nightmares and feelings of fear and hypervigilance. She has adequate self care skills and appears able to organize her own activities. She can deal with the public and communicate adequately with others. She will most likely function best in familiar settings with minimal stress and demands. She appears to understand and follow simple work instructions. Her ability to interact with others in a predictable manner is guarded. Her current ability to sustain effort and focus for the completion of assigned tasks is poor. Her ability to use appropriate judgment and demonstrate reliability is fair. Based on psychological functioning, her ability to engage in employment activities is limited but not precluded. It is felt that she is able to manage her own financial issues.

(T-747).

A psychiatric review technique regarding Claimant was completed on April 13, 2005. (T-748-761). After reviewing the file, it was determined that Claimant had PTSD, an anxiety related disorder, with no mention of schizoaffective disorder. (T-753-760). The reviewer found no episodes of decompensation. (T-758). The reviewer found that Claimant's IQ scores were not consistent with her history or her adaptive functioning. (T-760). A Mental Residual Functional Capacity Assessment was also completed as to Claimant on that same date. (T-762-764). The reviewer found that Claimant was not significantly limited in most areas of mental activity. (T-762-763). The reviewer determined that Claimant was moderately limited: in her ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular

attendance, and be punctual with customary tolerances; and the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.*

On January 18, 2006, Claimant was examined by Richard Carter Stodghill during an initial intake assessment for Middle Flint Behavioral HealthCare CSB. (T-813-816). Claimant was once again dishonest when she reported never having abused alcohol in her lifetime and never having been treated for alcohol abuse in her lifetime. (T-814). Claimant reported having experienced the following psychological problems during the past thirty days and during her lifetime: serious depression; serious anxiety or tension; hallucinations; and trouble understanding, concentrating, or remembering. (T-815). The diagnostic impression was listed as PTSD, with a deferred diagnosis on Axis II, and a GAF of 55. *Id.* In his recommendation for treatment, Stodghill noted that Claimant was referred after a Social Security Administrative Hearing on January 17, 2006. (T-816). Stodghill also noted that Claimant "purports a variety of psychiatric symptoms," was "hesitant to respond as if carefully calculating her responses, " and that Claimant stated, "[m]y forehead vibrates, and when it stops, I get scared, looking under the bed. I hear voices." *Id.* Stodghill stated that he "[did] not believe that she [was] reliable, with some component of malingering." *Id.*

There was no credible medical evidence that Claimant was totally disabled by her PTSD, her history of alcohol abuse, or her borderline intellectual functioning. "No symptom

or combination of symptoms[5] can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms." SSR 96-7p (effective 7/2/96) "Assessing The Credibility Of An Individual's Statements"; *see also, Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). Other circuits have held, and this court believes common sense dictates, that an ALJ is not required to include in his hypothetical questions to the vocational expert, limitations that he does not accept as true. *See Haynes v. Shalala*, 26 F.3d 812, 815 (8th Cir. 1994); *Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990); *Copeland v. Bowen*, 861 F.2d 536, 540-41 (9th Cir. 1988). After examination of the medical record, it does appear that the ALJ included all of the symptoms that he found credible in his hypothetical question to the VE.

Claimant also complains that the ALJ improperly discredited her treating psychiatrist's diagnosis of schizoaffective disorder. It is well settled that the opinion of a treating physician is entitled to substantial weight unless good cause exists for not heeding it. *Broughton v. Heckler*, 776 F.2d 960, 961-62 (11th Cir. 1985). A treating physician's report may be discounted when it is not accompanied by objective medical evidence or when it is conclusory. *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). The ALJ can also reject the opinion of any physician when the evidence supports a contrary conclusion or when it is contrary to other statements or reports of the physician. *Edwards v. Sullivan*, 937

---

[5]A symptom is an individual's own description of his physical or mental impairments. SSR-96-7p.

F.2d 580, 583-84 (11th Cir. 1991). *See also Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984).

To give a medical opinion controlling weight the ALJ "must find that the treating sources's opinion is 'well supported' by 'medically acceptable' clinical and diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion." S.S.R. 96-2p. Additionally, the ALJ must find that the treating source's opinion is "not inconsistent" with the other "substantial evidence" of record. *Id.*

The ALJ must weigh conflicting medical evidence and decide which opinions are entitled to the greatest weight. Social Security regulations confirm that the ALJ has discretion to weigh conflicting medical opinions. *See* 20 C.F.R. §§ 404.1527, 416.927. The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary. The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error. "Good cause" is found to exist when the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (omitting internal citations).

This court finds that the ALJ clearly articulated his reasons for giving less weight to the opinion of Dr. Ray or Dr. Keh in their diagnosis of schizoaffective disorder. Dr. Ray referred Claimant to Dr. Keh for treatment. (T-714). In her letter to Dr. Keh, Dr. Ray diagnosed Claimant with schizoaffective disorder with depression and paranoia. *Id.* Dr.

Ray's notes, however, indicate a diagnosis of "severe PTSD" which included "severe depression and psychotic processes." (T-715). There is nothing in the medical record to indicate why the results of the tests indicate one diagnosis in her notes, but her letter indicates another. (T-714-715). Nor did the medical records support Dr. Keh's diagnosis. Although Dr. Carden did include "schizoaffective disorder" in his findings, he noted that said diagnosis was by report. (T-719). As noted by the Sixth Circuit, a diagnosis alone says nothing about the severity of a claimant's condition. *See Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988) (additional citations omitted). Additionally, the ALJ noted that Dr. Keh had been placed on probation by the state medical board for three years for failing to complete proper examinations, failing to keep appropriate records, and being overanxious to prescribe narcotic medication. (T-25). The ALJ based the decision on the evidence of record, including Claimant's treating sources, medical records in evidence, the assessments and evaluations of state agency consultants, as well as the claims of limitations as subjectively alleged by the Claimant which, based on Claimant's history and the medical evidence, the ALJ found not entirely credible. (T-30). Upon review of the entire record, the Commissioner appears to have committed no error in applying the proper legal standard in discounting the opinions of Dr. Ray and Keh, and substantial evidence supports his decision.

## II.     Whether the ALJ committed error in determining the past work and other work Claimant was capable of performing?

The ALJ found that Claimant had the residual functional capacity to perform work at all exertional levels. (T-27). However, the ALJ limited Claimant to "performing simple

tasks only, which must be done in a structured environment where there will be help setting and reaching goals, and which requires no more than limited public contact." *Id*. Given those restrictions, the VE indicated that Claimant retained the ability to perform two of her former jobs, that of stocker and wire worker/assembler as previously performed and as performed in the national economy. (T-30, 961). Claimant was also found capable of performing other work as a cloth folder, kitchen helper, and a housekeeping cleaner. (T-962).

Claimant argues that the ALJ improperly relied on the VE's testimony because it conflicted with the Dictionary of Occupational Titles (DOT). (R-10, p.16). Additionally, Claimant argues that the ALJ failed to obtain an explanation for the conflict. *Id*. Specifically, Claimant argues that by limiting Claimant to "simple tasks," the ALJ limited her to performing only unskilled work. (R-10, p. 16). Claimant argues that the ALJ's conclusion that she can perform her past semi-skilled work as a wire worker/assembler (728.684-010) - which the DOT classifies as requiring an SVP of 3 - contradicts the ALJ's own findings. (R-10, p. 17). Claimant also argues that her RFC precludes her from performing her past work as a stocker (922.689-058), because it requires a GED:R2. *Id*. Claimant argues that as jobs with an R2 reasoning level require an individual to carry out detailed but uninvolved written or oral instructions, and the ALJ restricted Claimant to simple tasks, the Claimant would only have the ability to perform jobs classified as GED:R1, which require the ability to carry out only simple one-to-two step instructions. *Id*. For the same reason, Claimant argues that she also would be prevented from working as a cloth

folder (589.687-014) and a kitchen helper (318.687-010), because both jobs involve a GED:R2. *Id.* Finally, Claimant argues that she would be prevented from performing the housekeeper position (323.687-014), because it requires working under specific instructions, or "[attending to the work assignment instructions or orders of [a] supervisor." (R-10, p. 18).

In her first argument, Claimant contends that "simple tasks" are the same as "simple instructions" and that the DOT's use of the word "detailed" is equivalent with the Social Security Regulations' use of the words "detailed instructions." Claimant has presented no authority comparing the definitions, and none could be found by this court to indicate that said definitions were intended to be one and the same.

The regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a)(2007), 416.968(a)(2007). Therefore, a limitation to simple tasks is already presumed within the unskilled limitation, and is not a limitation above and beyond that classification. *See Vuxta v. Commissioner of Social Security*, 194 Fed. Appx. 874 , 878 (11th Cir. 2006)[6]. In Appendix C - Components of the Definition Trailer of the *Dictionary of Occupational Titles*, General Education Development (GED), Reasoning Development Level 2 requires that an individual "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." 1991 WL 688702 (defining GED:R2).

---

[6] Eleventh Circuit Rule 36-2 allows an unpublished case to be cited as persuasive authority. (CTA11 RULE 36-2).

Reasoning Development Level 1 requires that an individual "[a]pply commonsense understanding to carry out simple one - or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id*. (defining GED:R1).

Although it does not appear that the Eleventh Circuit has addressed this issue, it has been addressed in other circuits. In *Meissl v. Barnhart*, the court addressed the issue of whether a person limited to carrying out simple, repetitive instructions could still perform a job with a reasoning level of 2. 403 F.Supp.2d 981, 984 (C.D. Cal., 2005). In *Meissl*, the court reasoned:

> The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii); *see also* 20 C.F.R. 404, subpart P, Appendix 1, Listing 12.00C(3) ("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking . . . apprehend the most abstruse classes of concepts" at level six). DOT at 1010-1011. To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity. Even more problematic for [Claimant's] position is that she ignores the qualifier the DOT places on the term "detailed" as also being "uninvolved." This qualifier certainly calls into question any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's

> use of that term in the reasoning levels. Instead of simply
> seeking to equate the two scales based on the serendipity that
> they happen to employ the same word choice, a much more
> careful analysis is required in comparing the claimant's RFC
> with the DOT's reasoning scale. . . .

*Meissl*, 403 F.Supp.2d at 984. The court then determined that the claimant's reasoning level

was at a level two, rather than a one. *Id*; *citing Hackett v. Barnhart*, 395 F.3d 1168, 1176

(10th Cir. 2005) (holding that "level-two reasoning appears more consistent with Plaintiff's

RFC" to "simple and routine tasks"); *Money v. Barnhart*, 91 Fed.Appx. 210, 214, 2004 WL

362291, at *3 (3rd Cir. 2004)[7] ("Working at reasoning level 2 would not contradict the

mandate that her work be simple, routine, and repetitive").

Social Security Ruling 00-4p states, in relevant part, as follows:

> Occupational Evidence provided by a VE or VS generally
> should be consistent with the occupational information supplied
> by the DOT. When there is an apparent unresolved conflict
> between VE or VS evidence and the DOT, the adjudicator must
> elicit a reasonable explanation for the conflict before relying on
> the VE or VS evidence to support a determination or decision
> about whether the claimant is disabled. At the hearing level, as
> part of the adjudicator's duty to fully develop the record, the
> adjudicator will inquire, on the record, as to whether or not
> there is such consistency.

Even though there was not an apparent conflict, the ALJ did inquire if the VE's testimony

deviated from the DOT. (T-963). The VE responded that he "did not believe so." *Id*.

Because there was no "apparent conflict" between the VE's testimony and the DOT, the ALJ

was not required under SSR 00-4p to elicit a "reasonable explanation" from the VE as to the

---

[7] Eleventh Circuit Rule 36-2 allows an unpublished case to be cited as persuasive authority.
(CTA11 RULE 36-2).

positions containing a GED:R2 level. Therefore, the ALJ properly found that Claimant was capable of performing her past work as a stocker (DOT 922.687-058) and other work as a cloth folder (DOT 589.687-014, light, SVP 2, 78,000 jobs nationally, 1,200 in Georgia), and a kitchen helper (DOT 318.687-010, medium, SVP 2, 340,000/6,600). (T-30-31).

The ALJ also found that Claimant was capable of performing other work as a and a housekeeper (DOT 323.687-014, light, SVP 2, 286,000/4,500). (T-30-31). Claimant argues that she would be prevented from performing the housekeeper position, even though it requires a GED:R1 level, because it requires working under specific instructions, or attending to the work assignment instructions or orders of a supervisor. Although Claimant argues that she would be unable to handled the stresses of the supervision or lack of familiarity, her past work experience and evaluations indicate otherwise.

In her 2001 evaluation, Claimant reported that she worked weekends as a security guard for a period of time in 2000, but was fired for violating company policy when she "made a round around the premises in her own car." (R-378). Claimant did not indicate that she had any difficulty performing the job. *Id*. Additionally, when Claimant was evaluated by Nick Carden, Ph.D., on February 6, 2004, Claimant was working part-time, fifteen hours a week, at Dollar General Store. ( T-718). Claimant had been employed there for approximately one year. *Id*. Claimant stated to Dr. Carden that although "sometimes she gets scared at work," she was performing her job with little difficulty. *Id*. Claimant also stated that she had worked part-time at Bill's Dollar Store and that she worked at a dry cleaning service for four years. *Id*. After reviewing the information and interviewing

Claimant, Dr. Carden's prognosis was as follows:

> In the course of the evaluation, Mrs. West exhibited an effective intelligence that allowed her to fully comprehend and carry out verbal instructions. She had no difficulties with her vision, hearing and speaking during this interview. She did not require immediate supervision in order to sustain appropriate goal-directed behaviors. She demonstrated mild difficulties with her attention and concentration, but sufficiently completed most all of the requested routines. These abilities should carry over to a workplace where she would be able to make simple decisions, ask questions, request assistance, and perform most routine tasks.
>
> Mrs. West demonstrated no significant deterioration of personal habit or hygiene, which would be expected to carry over to a workplace. Her clinical behaviors were such as to indicate that she would be unduly distracting to co-workers or the general public. She should be able to interact with co-workers, supervisors, and/or the public. Given her psychiatric history she may have some difficulty adhering to a work schedule and meeting production norms. She may decompensate under stressful situations. . . . By self-report, she complained of some difficulties in performing activities of daily life. She did describe a constriction of interests. She did maintain she sometimes has difficulties in relating to others. No collateral report was available. There were some complaints of a loss of contact with reality, but the claimant's clinical behavior did not suggest that to be a problem. Her behavior did not include coarseness, inappropriateness, nor lability of affect. . . .

(T-719). Claimant stresses that Dr. Carden indicated that Claimant <u>may</u> decompensate under stressful situations, however, there is no indication from her extensive part-time work history in the relevant period that she had, and the evaluators found no evidence of decompensation. (T-739, 758). In her Mental Functional Capacity Assessment on April 13, 2005, it was determined that Claimant was not significantly limited in her ability to accept instructions

17

and respond appropriately to criticism from supervisors. (T-763). Furthermore, in his consultative examination, Dr. Carden specifically found that Claimant should be able to interact with co-workers, supervisors, and/or the public in performing work. (T-719). Therefore, this argument is also without merit.

Social Security Ruling SSR 00-4p states that unskilled work corresponds to an SVP of 1-2. Claimant also argues that the ALJ's conclusion that she can perform her past semi-skilled work as a wire worker/assembler (728.684-010), which the DOT classifies as requiring an SVP of 3, contradicts the ALJ's own findings. Having above determined that the ALJ properly found that jobs exist in a significant number in both the national and local economy that Claimant can perform, it is unnecessary to address this issue, as any error would be harmless error. Ergo, even if this court had found that the ALJ improperly concluded that Claimant could perform past relevant work, it would not necessitate remand in this instance. A remand to have the ALJ perfect the record would serve no practical purpose, would not alter the ALJ's findings, and would be a waste of judicial and administrative resources. *See Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997); *Ware v. Schweiker*, 651 F.2d 408, 412 (5th Cir. 1981); *see also Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 656 (1st Cir. 2000) ("a remand is not essential if it will amount to no more than an empty exercise"); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

**III.    Whether Claimant received a fair hearing not marred by any personal bias on the**

**part of the ALJ?**

Claimant argues that the ALJ improperly relied on evidence which was not in the record at the time of the hearing to impugn Claimant's credibility. (R-10, p. 18). Claimant further argues that the ALJ obtained irrelevant evidence he was not authorized to receive, and used derisive language in the decision. *Id.*

Social Security disability insurance benefit claimants are entitled to a hearing that is both full and fair. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). Hearing officers are presumed to be unbiased. *Schweiker v. McClure*, 456 U.S. 188, 195 S.Ct. 1665 (1981). A party can rebut this presumption by showing a conflict of interest or other specific reason for disqualification, but the burden of establishing a disqualifying interest is upon the person making the contention. *Id.* "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147 (1994). However, such statements will support a bias challenge "if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* To support such, a claimant must show that the ALJ engaged in conduct that was so extreme, it deprived the hearing of fundamental fairness mandated by due process. *Id.* at 555-56. The alleged bias or prejudice must arise from personal or extrajudicial sources and not from the record itself. *Colfor v. N.L.R.B.*, 838 F.2d 164, 168 (6th Cir. 1987); *First National Monetary Corp. V. Weinberger*, 819 F.2d 1334, 1337 (6th Cir. 1987). "To be disqualifying, the alleged bias must stem from an extrajudicial source and result in an opinion on the merits of some

basis other than what the judge learned from his participation in the case." *First National*, 819 F.2d at 1337; *quoting United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966).

Claimant complains that the ALJ improperly relies on evidence prior to September 17, 2003, to impugn Claimant's credibility, without said evidence being on the lists of exhibits provided to Claimant before her hearing. (R-10, p. 18-19). However, the Supreme Court has held that opinions held by judges as a result of what they learned in earlier proceedings are not subject to bias allegations. *Liteky*, 510 U.S. at 550-51.

Claimant argues that the ALJ incorrectly identified her problem with alcohol as "significant" in the time period of 1993-1995 and improperly indicated that her psychological symptoms were related to alcohol abuse. (R-10, p. 19). However, admission paperwork to "Starting Pointe" on January 24, 1995, does indeed indicate that Claimant admitted to drinking alcohol on a regular basis. (T-343). Claimant admitted to drinking seven beers at a time, approximately three times a week, or a case of beer a week. *Id*. Claimant stated that she drank to keep "from worrying" and because it made her "happier." *Id*. During this same social history update, Claimant admitted to prior crack-cocaine use, but stated she had been drug-free for seven years. *Id*. Claimant's plan of care at admission to Starting Pointe included counseling on alcoholism and the diagnostic impression for Axis I included alcohol abuse, current. (T-344-45). In her medical records dated January 26, 1995, from Dodge County Hospital, Dr. Lewis Petrea noted:

> Patient has a fairly significant history of drug and alcohol history. She at one point was drinking a twelve pack of beer a day, which she did for approximately 4 years. She also has a

> history of getting hooked on Tylox after the neck fracture in
> 1989 with difficulty coming off of it. . . . At the present time the
> patient does admit to having been drinking a case of beer a week
> for the last several months with her words being "I use it to self
> medicate." She says her last drink was the day of admission.

(T-350). Dr. Petrea's diagnostic impression of Axis I included alcohol abuse, current, and

the plans for treatment included addressing Claimant's history of substance abuse. (T-351).

Furthermore, the intake worksheet from the Community Mental Health Center of Middle

Georgia dated April 7, 1994, states that Claimant consumed alcohol until the summer of

1993, directly contradicting Claimant's allegation on June 2, 1993, that she last consumed

alcohol in 1991 and had not "had a drop since then." (T-369-70). Though not argued by the

claimant, the ALJ also noted that in Claimant's 2001 evaluation Dr. Randal Gage diagnosed

Claimant with alcohol abuse, depression, anxiety, and borderline intellectual functioning.

(T-24, T-377-379). Claimant informed Dr. Gage then that she was currently consuming

alcohol on a "frequent basis." (T-378). In her evaluation with Dr. Randall Gage, Claimant

also indicated that she had been jailed the prior year for a DUI charge. *Id.*

While discussing Dr. Long's findings in his April 2003 evaluation of Claimant, the

ALJ stated, "[a]lthough Claimant also alleged that she was mentally retarded/impaired and

illiterate, her test results revealed a Full Scale IQ score of 72 (borderline intellectual

functioning) and that she reads at a 5th grade level(Exhibit 65, p. 1-8)." (T-24). The ALJ

went on to state, "Dr. Long noted that Claimant's validity scale was problematic, thereby

suggesting that the claimant had been less than truthful regarding her test responses," and

also indicated that the state agency consultants also found that claimant was exaggerating.

(T-24, 516, 760). While the Claimant objects to the ALJ's phrasing, Dr. Long did find that: Claimant's validity scale was a problematic (T-516), Claimant had exhibited a higher level in regards to adaptive functioning over the years by looking after her children and working at times (T-517); there had been some substance abuse problems in the past that had interfered (T-517); and that Claimant needed to be encouraged to continue to work (T-518). Additionally, there is a plethora of conflicting information in the record as to whether or not the Claimant attended special education classes. (T-705, 706). At times Claimant alleges that she did not attend such classes (T-618), other times she states she did (T-717, 743). Claimant alleged in her function report on January 19, 2005, that she has a learning disability. (T-660-61, 666). Furthermore, on January 18, 2006, Mr. Stodghill stated that he did not believe Claimant was reliable and that there was a component of malingering present. (T-816).

Claimant argues the ALJ introduced extrajudicial evidence that Claimant's daughter, Brittany, was receiving Social Security benefits. However, the record indicates that at Claimant's hearing on April 18, 2002, Claimant herself informed the ALJ that Brittany had been approved for SSI since June 2001. (T-886). The ALJ asked a follow-up question and Claimant confirmed that she was the representative payee for her daughter. *Id.* It was at that same hearing, while Claimant was receiving Social Security benefits, that Claimant admitted that she had not been seeking mental health treatment. (T-890). The ALJ also encouraged Claimant to seek mental health treatment on a regular basis. (T-900).

Again in her April 9, 2003, hearing Claimant stated that her daughter was receiving

SSI and confirmed that she was the representative payee for her daughter's benefits. (T-912). Claimant indicated that she wanted to discuss the alcohol issue because she had not been drinking since before the tornado hit, approximately 1986. (T-918). At that time the ALJ brought several medical records to Claimant's attention which indicated that she had admitted to drinking regularly at her hospital admission in 1995, that she had been diagnosed as being dependent on alcohol by her family physician in 1999 and 2001, and that she had admitted to drinking frequently to Dr. Gage in 2001. (T-918-21).

Claimant stated at her administrative hearing on January 18, 2006, that her daughter was disabled and also stated that her daughter was mentally retarded. (T-935-36). Claimant again stated that she was her daughter's representative payee for the Social Security benefits. (T-936). Claimant's own attorney stated that Claimant "was granted benefits back in the nineties because of mental retardation and anxiety problems." (T-965). Her attorney also noted a full-scale IQ of 70, which he stated would be mental retardation under 12.05C." (T-965-66). The ALJ again encouraged Claimant to seek treatment on a regular basis. (T-969). Claimant's attorney at the hearing also noted that Dr. Keh's disciplinary record was in the record and the ALJ stated that he put it in the record as it "bears on the doctor's qualifications." *Id*. Claimant's attorney failed to lodge any objection to such. *Id*.

The ALJ's findings indicate that he sought from Plaintiff's counsel any new mental health treatment records since 2004, but received few new records. (T-26). Claimant argues that the ALJ "[i]gnored the fact that [Claimant] did not have Medicaid from March 2004 through December 2005," when the ALJ commented upon Claimant's lack of consistent

treatment. (R-10, p. 19). However, it is patently clear from the transcript of the administrative hearing that the ALJ was fully aware of Claimant's lack of Medicaid coverage during a certain period in 2004-2005. (T-938-39). In an attempt to discover why Claimant did not "have more updated medical records,"the ALJ questioned Claimant to discover what periods she was covered by Medicaid, why she was denied coverage, and if she was currently covered by Medicaid. (T-938-40). In his closing, while requesting that Claimant be evaluated again by a psychiatrist, Claimant's attorney stated "I'm just in this position of having – not a lot of – more medical treatment in the nineties that we do currently," acknowledging the lack of recent psychiatric treatment. (T-967). In response, the ALJ expressed concern over Claimant's lack of consistent mental health treatment, again noting that at least for a certain period, it did appear that Claimant did not have Medicaid coverage. (T-968). The ALJ then encouraged the Claimant to seek treatment on a regular basis. (T-969, 972-73).

Claimant also complains that the ALJ's knowledge and notation that Claimant's daughter had recently received a fully-favorable decision was improperly obtained private information that the ALJ was not authorized to receive. (R-10, p. 20). However, as noted above, Claimant revealed to the ALJ on at least two occasions that her daughter was receiving Social Security disability (or in the process of receiving disability) and Claimant disclosed that she was the representative payee for her daughter's funds. (T-912, 935-36). There is no indication that the ALJ received any information improperly from an outside source. Despite Claimant's contention to the contrary, evidence that Claimant was found

capable of handling funds on behalf of her daughter, is relevant to Claimant's contention that she fell below the borderline intellectual functioning range into the range of mental retardation.

As stated above, any alleged bias or prejudice must arise from personal or extrajudicial sources and not from the record itself. *Colfor v. N.L.R.B.*, 838 F.2d 164, 168 (6th Cir. 1987); *First National Monetary Corp. V. Weinberger*, 819 F.2d 1334, 1337 (6th Cir. 1987). "To be disqualifying, the alleged bias must stem from an extrajudicial source and result in an opinion on the merits of some basis other than what the judge learned from his participation in the case." *First National*, 819 F.2d at 1337; *quoting United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966). The remarks[8] complained of by Claimant, all have a basis in the record. There is no indication that the ALJ used extra-judicial information. Although some of the ALJ's comments made have been somewhat harsh, especially regarding Claimant's veracity, it is clear from the record that the comments stemmed from conflicting information submitted by Claimant. "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147 (1994). The statements made by the ALJ do not reveal such a high degree of favoritism or antagonism as to make fair judgment impossible, as required by *Liteky,* nor was the ALJ's conduct so extreme, it deprived the

---

[8] Although not all of the specific remarks addressed in Claimant's brief and reply were responded to individually in this argument, each argument was examined and reviewed thoroughly before this recommendation was written.

hearing of fundamental fairness mandated by due process.  *See Liteky* 510 U.S. at 555-56.

## CONCLUSION

In reviewing the record, no evidence of error is found to substantiate Claimant's contention that the RFC assessment was not based on all of the relevant evidence in the case record and was not adequately explained, that the ALJ committed error in determining the past work and other work, or that the Claimant failed to receive a fair hearing not marred by any personal bias on the part of the ALJ.  This Court finds that the decision of the ALJ is supported by substantial evidence.  Furthermore, the record fails to reveal evidence of the ALJ acting outside of his judicial role in making the required determinations.

**WHEREFORE**, it is the recommendation to the United States District Judge that the decision of the defendant Commissioner of Social Security be **AFFIRMED**.  Pursuant to 28 U.S.C. § 636(b)(1), Claimant may serve and file written objections to this recommendation with the UNITED STATES DISTRICT JUDGE within ten (10) days after being served a copy of this recommendation.

THIS the 31st day of March, 2008.


S/ G. MALLON FAIRCLOTH
UNITED STATES MAGISTRATE JUDGE

mZc